**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John Roehrs, M.D. and Jean Roehrs, his wife,<br><br>           Plaintiffs,<br><br>vs.<br><br>Minnesota Life Insurance Company, et al.,<br><br>           Defendants. | No. CV-03-1373-PHX-LOA<br><br>**ORDER** |

This matter arises on Defendant Minnesota Life Insurance Company's and Defendant Standard Insurance Company's ("Defendants" or "Minnesota Life") Motion For Summary Judgment on ERISA[1] preemption issues (doc. # 95), filed on May 13, 2005. Defendants contend that there are no genuine issues of fact that the subject insurance policy is part of an "employee welfare benefit plan" and, therefore, ERISA preempts all of Plaintiffs' state law claims. All parties have previously consented in writing to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c)(1). (document # 24)

After considering all the pleadings submitted on the subject motion, the relevant case law and the oral arguments of counsel made and recorded on September 28, 2005, the Court concludes: (1) that genuine issues of material fact exist for resolution by a trier of fact

---

[1] Employee Retirement Income Security Act of 1974 ("ERISA" or "the Act"), 29 U.S.C. §1001 et seq.

1  whether the subject policy relates to an "employee welfare benefit plan," (2) that if the
2  subject policy is an employee welfare benefit plan, the subject policy does not fall within the
3  Department of Labor's "safe harbor" regulation because the policy's premiums were paid by
4  Dr. Roehrs' employer from 1992 to mid-1999 and the employer was not a mere conduit for
5  the premium payments, and (3) that ERISA does not apply to the subject insurance policy
6  because it is a "converted policy"[2] and, therefore, is not "related to" an ERISA plan for
7  purposes of ERISA preemption. The subject motion will be denied in part and granted in
8  part.

## THE ALLEGATIONS

10  This lawsuit arises out of Defendants' denial of John and Jean Roehrs' ("the
11  Plaintiffs" or "Dr. Roehrs") claim for benefits under an income protection and disability
12  insurance policy issued by Minnesota Life in April, 1992. Defendants contend ERISA is the
13  exclusive source of Plaintiffs' remedies, if any, because the subject disability policy is part
14  of an "employee welfare benefit plan" within the meaning of the federal Act which, therefore,
15  would preempt Plaintiffs' state law theories of recovery: breach of contract, breach of the
16  implied covenant of good faith and fair dealing, punitive damages, breach of fiduciary duty,
17  negligence and estoppel.[3]  (document # 95) Defendants also allege that Plaintiffs cannot not
18  rely on ERISA's "safe harbor" exemption found in an industry-accepted Department of Labor
19  regulation to avoid ERISA governance.  29 C.F.R. § 2510.3-1(j); Stuart v. UNUM Life Ins.
20  Co. of America, 217 F.3d 1145, 1149 (9th Cir. 2000). (document # 95)

21  Plaintiffs counter with arguments that, among others, the subject disability
22  insurance policy is not part of an "employee welfare benefit plan" as this phrase is defined

---

[2] Like the Ninth Circuit's opinion is Waks v. Empire Blue Cross/Blue Shield, 263 F.3d 872, 874 (9th Cir. 2001), the undersigned refers to Plaintiffs' individual insurance policy obtained by exercising a conversion right as a "converted policy" or "individual policy."

[3] Section 1144(a) states that ERISA provisions "shall supercede any and all State laws insofar as they may now or hereafter relate to any [ERISA] employee benefit plan." 29 U.S.C. § 1144(a).

by ERISA and the cases interpreting the Act or that the subject policy falls within ERISA's "safe harbor" exemption. (document # 109) They also contend that even if the subject policy were governed by ERISA related to an ERISA plan at one time, which they deny, when Dr. Roehrs terminated his employment with his Nebraska employer, moved to Arizona and converted his individual policy to direct-pay, reinstated policy and thereafter made all the premium payments himself, ERISA does not control Plaintiffs' remedies for any alleged breach of the policy's provisions.

## FACTUAL BACKGROUND

The genesis of this lawsuit is the fall of 1991. While living with his family and practicing pulmonary and critical care medicine in Omaha, Nebraska, Dr. Roehrs was employed by Pulmonary Medicine Specialists, P.C. ("PMS"), a small professional corporation. (PSSOF,[4] ¶ 1; DSOF, ¶ 11) PMS employed only three pulmonologists in 1992 with only Dr. Roehrs (50%) and Dr. John Connolly (50%) having ownership interests in the professional corporation until Dr. Guillermo Huerta acquired an ownership interest sometime in 1993 or 1994.[5] (DSOF, ¶ 12 and ¶ 14) Although there is no evidence of a written employment agreement prior to 1998, the evidence presented shows that Dr. Roehrs had a written employment contract with PMS in 1998, effective beginning on January 1, 1996. (DSOF, ¶ 13; PSSOF, ¶ 2) PMS also employed an office manager, Janice Sandel, during the relevant time period who performed all the administrative responsibilities for PMS. (DSOF,

---

[4] Citations to "PSSOF" or "DSOF" are to Plaintiffs' Supplemental Statements of Fact in Support of their Responses to Defendants' Motions for Summary Judgment and the supporting exhibits or Defendants' Statements of Fact in Support of their Motions For Partial Summary Judgment and the supporting exhibits. (documents # 110 and # 96, respectively). Citations to "DSSOF" or "DRPSOF" are to Defendants' Supplemental Statement of Facts deemed filed on September 13, 2005 or Defendants' Response To Plaintiffs' Statement of Facts. (documents # 114, # 123 and # 105, respectively)

[5] Dr. Huerta was the junior physician in the practice who had no ownership interest in PMS during early '90s. (PSSOF, ¶ 1; DSOF, ¶ 14)

- 3 -

¶ 76 and ¶ 77)  In the summer of 1999, Dr. Roehrs terminated his employment with PMS and moved to Arizona with his family where he continued to practice medicine. (PSSOF ¶ 4)

Although not especially important, it is factually disputed who selected the subject insurance policy with Minnesota Life in 1992.[6] In the fall of 1991, Carol Anderson ("Anderson"), a licensed independent insurance agent[7] in Nebraska, advised Dr. Roehrs that his then disability insurance carrier, Mutual Life, was in financial trouble at the time when Dr. Roehrs was considering increasing his disability benefits coverage due to his increasing income. (PSSOF, ¶¶ 9 - 14; DSOF, ¶ 16)  According to him, Dr. Roehrs told Anderson that Dr. Connolly had a Minnesota Life disability policy and suggested she compare Minnesota Life's policy and benefits with the other companies' policies she was examining. Eventually, Anderson placed the subject policy with Minnesota Life through George Fowler ("Fowler"), a general agent for Minnesota Life, beginning on April 4, 1992. (PSSOF ¶¶ 15 - 20; DSOF, ¶ 1)  Dr. Roehrs himself never had any direct communications with anyone at Minnesota Life in connection with the purchase of the subject policy.  (DSOF, ¶ 18)

Dr. Roehrs thought it would be advantageous to go with a Minnesota Life disability policy because of its "list bill" form of invoicing which would allow for easier payments to Minnesota Life and, in return,  Dr. Roehrs, Dr. Connolly or PMS would pay reduced premiums if only one annual or two semi-annual billing statements were mailed directly to PMS, instead of the individual doctors, and only one check for the two or three policies were mailed back to Minnesota Life. (PSSOF, ¶¶ 21, 23; DSOF, ¶ 16)  It is undisputed that since the beginning of Dr. Roehrs' coverage under the subject policy with Minnesota Life until Dr. Roehrs' move to Arizona in mid-1999, PMS received all the premium notices and paid all the premiums. (DSOF, ¶¶ 20 - 22)  Unlike with his prior

---

[6] Dr. Roehrs denies selecting Minnesota Life and believes Dr. Connolly did. (DSOF, ¶ 17 )  Anderson claims that Dr. Roehrs selected Minnesota Life. (PSOF, Exh. 4, page 34)

[7] Plaintiffs argue that Anderson was a subagent for Minnesota Life. The Court does not believe that her correct legal relationship to Dr. Roehrs or Minnesota Life is important to appropriately resolve the subject motion.

- 4 -

1  disability policy which Dr. Roehrs paid to Mutual Life himself, there is no reliable evidence
2  that Dr. Roehrs paid his portion of the annual or semi-annual premiums[8] with personal
3  checks or that PMS charged the premium payments back to Dr. Roehrs as additional income
4  or deducted the premium amounts from his bonus at year end.[9] (DSOF, ¶ 15, ¶¶ 20 - 23)
5  According to the Plaintiffs, there were three individual policies[10] providing disability
6  coverage for the three individual doctors and that the policies were never thought to be, or
7  written as, a group disability policy. (PSSOF, ¶¶ 25 - 27)  Dr. Roehrs' disability policy was
8  clearly issued in his name as the owner of the policy and neither PMS nor the doctors as a
9  group are identified as having any ownership or beneficial interest in it or another doctor's
10 disability policy with Minnesota Life. (PSSOF, ¶ 28)

11      Disagreement between the parties exists whether Dr. Roehrs intended to have the
12 premiums paid initially by PMS with the amount of the premiums ultimately included in his
13 yearly taxable income or deducted from his annual bonus and whether the purpose of the
14 subject policy was to provide "an Employee Benefit Plan as defined under ERISA." The box
15 is checked on the original application, page 3, Section D indicating that the premiums for the
16 subject policy were initially to be paid by the employer and thereafter those premiums would
17 be included in Dr. Roehrs' annual income. (PSSOF, ¶¶ 29 - 33, Exh. 6A)  Dr. Roehrs'
18 handwritten note in the Remarks portion of Section D at the bottom of the same page
19 indicates "100% included" and is circumstantial evidence of Dr. Roehrs' intent, supporting

---

[8] Dr. Roehrs' policy required an annual premium payment of $5,405.68 or $2,756.90 on a semi-annual basis. (DSOF, Exh. 1, p. 1A)

[9] While Dr. Roehrs testified that it was his intention that the premiums, paid by PMS, should have been deducted from his yearly bonuses, he is uncertain whether, in fact, those premium payments for his disability policy from 1992 through 1999 were deducted from his bonuses. He knows of no records that would show the amounts of the premium payments for his policy were deducted from his bonuses because he "never did pay attention . . . the accountant did all of that."  (DSOF, Exh. 2, pp. 179 - 180)

[10] The parties have not submitted copies of the policies for Dr. Connolly or Dr. Huerta with Minnesota Life during the relevant period.

- 5 -

1   his testimony, that in 1992 he intended to be personally responsible for the amount of his
2   yearly premium payments as part of his yearly salary or bonus, i.e., he never intended PMS
3   to pay his premiums without those payments being factored into his yearly income. After the
4   policy was issued, however, in mid-August 1992 when Anderson and Fowler exchanged
5   faxed forms and corrected a mistake in Dr. Roehrs' base benefit of $7500 per month instead
6   of the requested $8500 per month, someone other than Dr. Roehrs, Anderson or her
7   secretary, according to the Plaintiffs, changed the answer to "No" that the premiums would
8   not be included in Dr. Roehrs' income. (PSSOF, ¶¶ 41 - 51, Exh. 7A and 7B)  Defendants
9   contend that Anderson testified that submitting the amended page containing Dr. Roehrs'
10  signature, dated August 18, 1992, and marking the "No" box indicating that the premium
11  would not be included in Dr. Roehrs' income was necessary to increase the amount of
12  coverage under the policy. (DSOF, Exh. 34; PSSOF, Exh. 7A and 7B)  Defendants cite
13  Anderson's testimony that she was aware of the changes in the amended application.
14  (DSSOF, ¶ 1)  Defendants, however, provide no explanation from an insurance or ERISA
15  perspective why it was necessary that the subject policy be part of or relate to an ERISA plan
16  in order to increase Dr. Roehrs' benefits $1000 per month yet maintain his rated age at 47
17  years if that were Dr. Roehrs' true intention in signing the amended application.

18           It is undisputed the Dr. Roehrs, not PMS, applied for the subject policy. The
19  subject policy lists "John D. Roehrs" as both the policy's insured and owner. (DSOF, Exh.
20  1, p. 1A)  In fact, the Court can find no reference in the subject policy to PMS and any
21  renewal of the policy on a yearly basis or beyond age 65 is not tied to Dr. Roehrs' continued
22  employment with PMS. (Id. at "Your Policy Information" page which is unnumbered.) Also
23  on the original application, Part 3, the insurance agent's checklist included, among others, the
24  following:

25  >   H. Is the purpose of this insurance to provide an Employee Benefit Plan as
>   defined under ERISA? If yes, complete Employee Benefit Plan Statement and
26  >   Qualified Plan Data
>   ☐ Yes    ☐ No
27
>   1. Are administrative services for this pension plan provided by Minnesota Life?
28

- 6 -

2. Indicate type of benefit plan: ☐Pension Trust ☐Profit Sharing ☐ Split Dollar The "No" box was "X"ed affirmatively stating that the purpose of the subject insurance was not to provide an employee benefit plan as defined under ERISA. (PSSOF, ¶ 38, Exh. 8; AND054)  Anderson confirmed in her deposition that the "No" box was intentionally checked because she and Dr. Roehrs did not complete the employee benefit statement and qualified plan document portion of the application. (Id. at ¶ 40)  There is no evidence that this portion of the original application was ever amended. Moreover, Defendants cite no evidence in the record that PMS had an ERISA plan of any kind at any time while Dr. Roehrs was employed by PMS except to the extent that the premium payments of the subject policy may have "established" an ERISA employee plan.

To the contrary, Plaintiffs demonstrate that Janice Sandel, the office manager and person most knowledgeable on administrative matters, knows nothing about PMS having an ERISA plan of any kind for PMS employees during the relevant period. (PSSOF, ¶ 76 and ¶ 77)  There is no showing that any PMS documents existed that discussed or referred to an employee benefit plan itself, much less the details of any such plan, that should have been distributed to PMS employees; that there was in existence at any time an identified, formal ERISA plan administrator or that disability insurance was voluntary or not for all PMS employees.[11]  No evidence is presented whether PMS went out of business or remained in business after Dr. Roehrs terminated his employment and moved to Arizona in 1999.

Initially, Dr. Roehrs, and subsequently his family, voluntarily moved to the Phoenix/Scottsdale area in the summer of 1999.  The parties agree that the October 4, 1999 premium was not timely paid and the subject policy lapsed for failure to pay that premium. (DSOF, ¶¶ 24 and 25; Exh. 5; PSSOF, ¶ 22)  Dr. Roehrs did not inform Minnesota Life, and it is unlikely that anyone else did, that he moved to Arizona.  No one at PMS forwarded the October 4, 1999 premium notice to Dr. Roehrs after he moved to Arizona. (DSOF, ¶ 30)  At

---

[11] If participation in the group insurance plan was not "completely voluntary" for employees, ERISA governs the plan. 29 C.F.R. § 2510.3- 1(j)(2)

- 7 -

1  oral argument, counsel clarified that when Dr. Roehrs discovered that his policy had lapsed,
2  he promptly made two premium payments, each of $2,757, one by regular mail and the other
3  by overnight delivery, because he was concerned that a single payment by regular mail would
4  not be timely received by Minnesota Life. It is not clear what the premium due date was for
5  1999; the Court assumes the due date is the policy's anniversary date of April 4, 1999 and
6  that the premiums were paid semi-annually. It is undisputed that Dr. Roehrs' premium
7  payment was received by Minnesota Life on December 2, 1999. Apparently Minnesota Life
8  does not accept advance premium payments because it was "not able to apply [Dr. Roehrs'
9  second December, 1999] payment[]" to the subject policy. By letter to Dr. Roehrs, dated
10 December 8, 1999, Minnesota Life refunded the other $2,757 payment directly to Dr. Roehrs,
11 confirming that the subject policy was paid to its anniversary date of April 4, 2000. (PSSOF,
12 ¶ 5, Exh. 14)

13 On December 2, 1999, Minnesota Life reinstated the subject policy through the
14 Quick Reinstatement Offer For Policies Which Have Lapsed ("QRO"[12]) as identified in the
15 Notice Of Policy Lapse And Reinstatement Offer (DSOF, Exh. 5) which Dr. Roehrs
16 purportedly signed on November 30, 1999.[13] Counsel agreed at oral argument that Dr.

---

[12] The QRO provides, in part, as follows:
*       *       *       *       *       *
REINSTATEMENT REQUIREMENTS
We will restore your policy to an active status if the following conditions are met:
1. Payment of the net reinstatement fee due is received at the Company's home office on or before December 3, 1999, and
2. The payment due is received while the insured is still living, and
3 The insured has not seen a health care practitioner, suffered from an injury, been sick or disabled since the premium paid to date of October 4, 1999.

If we decline to reinstate your policy, your reinstatement fee will be refunded and the policy will remain lapsed. Any disability occurring during the period of lapse may not be covered by your reinstated policy. Please refer to the reinstatement provisions of your policy for further explanation

[13] The QRO, its interpretation and Minnesota Life's practice of not sending notices to its insured whose premium had not been received until after the 31-day grace period had run

- 8 -

1  Roehrs has personally paid all the policy's premiums from December, 1999 to the present
2  time. It is undisputed that the subject reinstated policy has different coverage conditions and
3  terms than if the original policy had never lapsed.[14]

4  On May 25, 2000, Dr. Roehrs submitted a Disability Claim Notice ("DCN")
5  (DSOF, Exh. 6) to Minnesota Life, requesting disability benefits due to his "back/leg
6  pain/numbness/weakness" written in the "Sickness" section of the DCN with the "Date of
7  Sickness" identified as April, 2000. (DSOF, ¶ 32) This Court has previously ruled that
8  questions of fact exist for jury resolution on whether Dr. Roehrs has a "disease" which was
9  first diagnosed in 1997 which may be excluded from the reinstated policy or whether Dr.
10 Roehrs sustained a disabling back injury as a result of a tripping incident on a golf course in
11 April, 2000 after the policy was reinstated. This issue and others, such as, contract
12 interpretation, choice of law, and the existence of bad faith are not germane to the subject
13 motion.

## SUMMARY JUDGMENT

15 A Court must grant summary judgment if the pleadings and supporting
16 documents, viewed in the light most favorable to the nonmoving party, "show that there is
17 no genuine issue as to any material fact and that the moving party is entitled to judgment as
18 a matter of law." Rule 56(c), FRCvP ; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106
19 S.Ct. 2548, 2552 (1986); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.
20 1994). Substantive law determines which facts are material. Anderson v. Liberty Lobby,
21 Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); Jesinger, 24 F.3d. at 1130. In addition,
22 "[o]nly disputes over facts that might affect the outcome of the suit under the governing law

---

are issues in Plaintiffs' breach of contract and bad faith claims but are irrelevant for purposes of the subject motion.

[14] The subject policy defines "sickness" as "[a] disease or illness", (DSOF, ¶ 3), and provides, in part, regarding a reinstated policy: " . . . Any loss due to sickness will be covered if the sickness first manifested itself more than 10 days after the date of reinstatement. . . ." (Emphasis added.) (DSOF, ¶ 6) Also, the General Definitions of the subject reinstated policy provides that a "reinstated policy will cover any loss that results from an injury [Dr.Roehrs] sustain[ed] after the date of reinstatement." (PSOF, ¶ 1; DSOF ¶ 6)

- 9 -

1 will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248, 106
2 S.Ct. at 2510. The dispute must be genuine, that is, "the evidence is such that a reasonable
3 jury could return a verdict for the nonmoving party." Id.

4       A principal purpose of summary judgment is "to isolate and dispose of factually
5 unsupported claims." Celotex, 477 U.S. at 323-24, 106 S. Ct. at 2553. Summary judgment
6 is appropriate against a party who "fails to make a showing sufficient to establish the
7 existence of an element essential to that party's case, and on which that party will bear the
8 burden of proof at trial." Id. at 322, 106 S.Ct. at 2553; Citadel Holding Corp. v. Roven, 26
9 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the
10 opponent has the burden of proof at trial. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552.

11       The party opposing summary judgment "may not rest upon the mere allegations
12 or denials of [the party's] pleadings, but. . . must set forth specific facts showing that there
13 is a genuine issue for trial." Rule 56(e), FRCvP; Matsushita Elec. Indus. Co., Ltd. v. Zenith
14 Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1356 (1986). Brinson v. Lind Rose Joint
15 Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). There is no issue for trial unless there is
16 sufficient evidence favoring the nonmoving party. If the evidence is merely colorable or is
17 not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-
18 50, 106 S.Ct. at 2511. However, "[t]he evidence of the non-movant is to be believed, and
19 all justifiable inferences are to be drawn in his [or her] favor." Id. at 255, 106 S.Ct. at 2513
20 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598,1608-1609
21 (1970)). In evaluating the evidence submitted by both parties, all evidence and inferences
22 to be drawn therefrom must be construed in the light most favorable to the nonmoving party.
23 T.W. Elec. Services v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630-31 (9th Cir.1987).

24       In Anderson, the Supreme Court explained that the summary judgment standard
25 mirrors the standard for a directed verdict. Anderson, 477 U.S. at 250-52. The inquiry under
26 each is the same: whether the evidence presents a sufficient disagreement to require
27 submission to a jury or whether it is so one-sided that one party must prevail as a matter of
28 law. Put another way, summary judgment should be granted where the nonmoving party fails
to offer evidence from which a reasonable jury could return a verdict in its favor. Id. at 252,

1  The mere existence of a scintilla of evidence in support of the non-moving party's position
2  is not sufficient. Id.
3  Whatever facts which may establish a genuine issue of fact must both be in the
4  district court's file and set forth in the opposing pleadings and statement of facts. Carmen v.
5  San Francisco Unified School District, 237 F.3d 1026, 1029 (9th Cir. 2001). The trial court:

> may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers. Though the court has discretion in appropriate circumstances to consider other materials, it need not do so. The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.

10  Id. at 1031.
11  Additionally, on a motion for summary judgment, the trial court is not permitted to weigh the
12  evidence, pass upon credibility, or speculate as to the ultimate findings of fact. Pepper &
13  Tanner, Inc. v. Shamrock Broadcasting, Inc., 563 F.2d 391, 393 (9th Cir. 1977).

14  **DISCUSSION**

15  **A. An Employee Welfare Benefit Plan**

16  While ERISA preemption is a question of law, Waks v. Empire Blue Cross/Blue
17  Shield, 263 F.3d 872, 874 (9th Cir.2001), the existence of an ERISA plan is a question of fact
18  to be answered in the light of all surrounding circumstances from the point of view of a
19  reasonable person.[15] Stuart v. UNUM Life Ins. Co. of America, 217 F.3d 1145, 1149 (9th
20  Cir.2000)(quoting Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1120 (9th Cir.1998));
21  Schwartz v. Provident Life and Accident Ins. Co., 280 F.Supp.2d 937 (D.Ariz.2003).
22  Because Defendants' claim of ERISA preemption is a federal defense, the burden is on the

---

[15] There is not circuit uniformity on this test. For example, to determine whether a particular plan qualifies as an ERISA plan in the Fifth Circuit, one asks whether "(1) [the plan] exists; (2) falls with the safe harbor exclusion established by the Department of Labor; and (3) meets the ERISA requirement of establishment or maintenance by an employer for the purpose of benefitting the plan participants." McNeil v. Time Ins. Co., 205 F.3d 179, 189 (5th Cir.2000); Meredith v. Time Ins. Co., 980 F.2d 352, 355 (5th Cir.1993). A plan is said to exist if a court can determine "from the surrounding circumstances [that] a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits." Magee v. Life Ins. Co., 261 F.Supp.2d 738, 749 (S.D.Tex.2003)(quoting Meredith, 980 F.2d at 355.)

defendant to prove the facts necessary to establish it. Kanne v. Connecticut General Life Ins. Co., 867 F.2d 489, 492 n. 4 (9th Cir.1988), cert. denied, 492 U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); Zavora at 1120 n. 2; Schwartz at 939.

Any analysis whether the subject disability policy is part of an "employee benefit plan" must begin with the phrase's definition. ERISA defines an "employee benefit plan" to include, among others, "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance . . . benefits in the event of . . . disability . . . ." 29 U.S.C. § 1002(1); Stuart at 1149 (quoting Qualls ex rel. Qualls v. Blue Cross of California, Inc., 22 F.3d 839, 843 (9th Cir.1994)).

The First Circuit, in a case cited with approval by the Ninth Circuit in Waks, has stated that "[t]his nearly tautological definition offers little guidance." Demars v. CIGNA Corporation, 173 F.3d 443, 445 (1st Cir. 1999); Curtis v. Nevada Bonding Corp.,53 F.3d 1023, 1028 (9th Cir.1995)("The precise definition of a 'plan, fund, or program' is less than well defined . . . .'"). The key phrase in Demars, as it is here, is "established or maintained by an employer." As Demars points out, "no single act in itself necessarily constitutes the establishment of the plan, fund, or program," Donovan v. Dillingham, 688 F.2d 1367, 1373 (11th Cir.1982) (en banc), quoted in Belanger v. Wyman-Gordon Co., 71 F.3d 451, 455 (1st Cir.1995), and "[t]here is no authoritative checklist that can be consulted" to determine whether an employer's actions establish an ERISA plan. Belanger, 71 F.3d at 455. Moreover, Zavora teaches that even though an employer's plan may not fall within ERISA's "safe harbor" exemption (because, for example, PMS paid all premiums on the subject policy until mid-1999, as is more fully discussed below), the ultimate issue still remains: whether an ERISA plan was "established or maintained" by PMS. Zavora, 145 F.3d at 1121.

Here, Plaintiffs have presented considerable evidence that no plan was established or maintained by PMS. Dr. Roehrs' testimony that it was not their intent to create an ERISA plan when he purchased the subject policy, the boxes checked on the original application forms, the absence of an amendment to the original application that the purpose of the subject insurance was not to provide an employee benefit plan as defined under ERISA, the

1 individual policy itself and that it was not a group policy, the absence of an ERISA plan
2 administrator or any documents establishing an ERISA plan relating to disability insurance
3 or any other benefits reasonably support a finding that PMS did not establish or maintain an
4 ERISA plan for disability insurance. There is, however, evidence that reasonably supports
5 Defendants' claim that an ERISA plan was established or maintained with respect to the
6 subject policy: PMS was not a mere conduit for the premium payments because all payments
7 were paid by PMS from 1992 to mid-1999 with no reimbursement to PMS by Dr. Roehrs,
8 no reliable evidence that the premium amounts were, in fact, included in Dr. Roehrs' yearly
9 income or deducted from his yearly bonus, the amended application form, and, perhaps,
10 others.  Whether it was intentional that the subject policy be part of an ERISA plan with the
11 premium amounts intended to be included in Dr. Roehrs' income or whether this was a
12 insurance agent's or someone else's error, not caught and corrected by Dr. Roehrs in 1992 or
13 thereafter which the insurers are now using as a shield to avoid Plaintiffs' legal remedies for
14 allegedly wrongfully denying Plaintiffs' claim is a question for a finder of fact. Clearly, PMS
15 had nothing to do with the maintenance of an ERISA plan except for the payment of the
16 premiums on the subject disability policy. A triable issue of fact exists for the finder of fact.

**B. "Safe Harbor" Exemption**

Assuming <u>arguendo</u> that the subject insurance policy is an ERISA plan, Plaintiffs argue that "safe harbor" exemption applies. A benefit plan can fall outside the coverage scope of ERISA if it meets the four requirements under the Department of Labor's safe harbor regulation. 29 C.F.R. § 2510.3-1(j). These four requirements are:

(1) No contributions are made by an employer or employee organization;

(2) Participation in the program is completely voluntary for employees or members;

 (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

 (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or due checkoffs.

1    Id.; Stuart, 217 F.3d at 1149; The Meadows v. Employers Health Ins., 826 F.Supp. 1225,
2    1228 (D.Ariz.1993). Moreover, "an employer's failure to satisfy just one requirement of the
3    safe harbor regulation conclusively demonstrates that an otherwise qualified group insurance
4    plan is an employee welfare benefit plan under ERISA." Stuart, 217 F.3d at 1151-2.
5             In this case, Plaintiffs contend that "PMS never actually paid any portion of the
6    cost of the premiums[]" and was "'merely a conduit for the premium payments actually made
7    by the insureds, which is conduct which would meet the requirements of the first harbor
8    factor'", citing Schwartz at 941. The Court wonders if Plaintiffs' counsel are considering the
9    facts of some other case because these alleged facts, or reasonable inferences therefrom, are
10   certainly not the evidence in this case. The evidence in this case is not at all like Schwartz
11   where the evidence established that the employer was a mere conduit and charged back to
12   its employee-insured 100% of the premium costs that the employer paid. Id. at 942. In the
13   case sub judice, the evidence is clear, and no reasonable juror or trier of fact could disagree,
14   that PMS received all the premium notices and paid all the premiums. (DSOF, ¶¶ 20 - 22)
15   Unlike with his prior disability policy which Dr. Roehrs paid to Mutual Life himself, it is
16   sheer fantasy that Dr. Roehrs paid his portion of the annual or semi-annual premiums to
17   Minnesota Life with personal checks or that PMS in some fashion charged the premium
18   payments back to Dr. Roehrs as additional income or deducted the premium amounts from
19   his bonus at year end.
20            Since Plaintiffs have only challenged the alleged absence of the first prong (no
21   contributions were made by an employer or employee organization) in response to
22   Defendants' motion and Defendants have sustained their burden of proof as to the other three
23   prongs, the Court finds that Defendants are entitled to judgment as a matter of law that
24   ERISA's safe harbor exemption does not apply in this case.
25
26   **C. ERISA Preemption Applicability to a Converted Policy or Individual Policy**
27            Plaintiffs oppose Defendants' motion on the grounds that even if the original
28   disability policy falls within the meaning of ERISA's employee welfare benefit plan, which
     Plaintiffs deny, once Dr. Roehrs terminated his employment with PMS in mid-1999 and

personally paid the premiums for a reinstated policy from December, 1999 to the present time, the subject policy became a "converted policy" outside the scope of ERISA regulation. Waks v. Empire Blue Cross/Blue Shield, 263 F.3d 872 (9th Cir. 2001); Demars v. CIGNA Corp., 173 F.3d 443 (1st Cir. 1999). This Court agrees.

Defendants rely upon Massachusetts Casualty Ins. Co. v. Reynolds, 113 F.3d 1450 (6th Cir.1997) which was flatly rejected by the Ninth Circuit in Waks, as does the undersigned, because the Reynolds case did not decide whether a true converted policy is subject to ERISA. Waks, 263 F.3d at 878. In Waks, the Court determined that:

> A converted policy is created when an ERISA plan participant leaves the plan and obtains a new, separate, individual policy based on conversion rights contained in the ERISA plan. The contract under the converted policy is directly between the insurer and insured. It is independent of the ERISA plan and does not place any burdens on the plan administrator or the plan. There are also no relevant administrative actions by the employer. See Fort Halifax, 482 U.S. at 16, 107 S.Ct. 2211 ("It would make no sense for pre-emption to clear the way for exclusive federal regulation, for there would be nothing to regulate.").

263 F.3d at 876.

Here, similar to the insurance policy in Waks, Dr. Roehrs' reinstated policy is a "new, separate, individual policy" that provides different terms for disability benefits coverage than the original policy even assuming the original policy, in effect while Dr. Roehrs was a PMS employee, was something other than an individual policy or was based on conversion rights contained in an ERISA plan. The different reinstated policy is new and independent of an ERISA plan, assuming there ever was such a plan, and certainly placed no burdens whatsoever upon PMS, its plan administrator or an assumed plan since mid-1999. A finding here that ERISA no longer regulates the reinstated policy does not frustrate the two central objectives of ERISA regulation: protection of employee interests and administrative ease for employers. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 137, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); Waks at 875. Indeed, a finding of ERISA preemption here, as in Waks, would be "an absurd result" because it would only protect an insurer which may have wrongfully denied Plaintiffs' claim in a situation wherein the former employer has had nothing to do with the original policy or its premium payments since mid-1999. The Court in Waks recognized that Demars persuasively explains that ERISA preemption applies

1  neither to converted policies generally, nor to specific types of converted policies. Id. at 877.
2  This case presents another type of such a converted policy, i.e., a reinstated policy.
3  Defendants' motion that ERISA preempts Plaintiffs' claims arising under the subject
4  reinstated policy is denied.

Accordingly,

**IT IS ORDERED** that Defendants' Motion For Summary Judgment on ERISA preemption issues (doc. # 95) is **DENIED** in part and **GRANTED** in part as follows: (1) A triable issue of fact exists whether the subject disability policy relates to an "employee welfare benefit plan" within ERISA's definition, (2) assuming that the subject policy is part of an ERISA plan, Defendants are entitled to summary judgment as a matter of law that ERISA's safe harbor exemption is inapplicable in this case, and (3) ERISA does not preempt Plaintiffs' claims arising under the subject reinstated policy.

DATED this 7th day of October, 2005.

*/s/ Lawrence O. Anderson*
Lawrence O. Anderson
United States Magistrate Judge