1    **WO**

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9    John Roehrs, M.D. and Jean Roehrs, his)    No. CV-03-1373-PHX-LOA
     wife,                                  )
10                                          )    FINDINGS OF FACT
              Plaintiffs,                   )    AND
11                                          )    CONCLUSIONS OF LAW
     vs.                                    )
12                                          )
                                            )
13   Minnesota Life Insurance Company, et al.,)
                                            )
14            Defendants.                   )
                                            )
15   _____)

16

17          A bench trial was held on December 7th and 8th, 2005 and was continued to

18   January 27th, 2006, to allow the attorneys to supplement the trial record on certain tax issues.

19   All parties have previously consented in writing to magistrate judge jurisdiction pursuant to

20   Title 28 U.S.C. § 636(c)(1). (docket # 24)  The parties have agreed that a trial on the ERISA

21   issues should be to the court, not a jury.  (docket # 136 at ¶ M)  Jurisdiction exists pursuant

     to Title 28 U.S.C. § 1332. (Id. at ¶ B)  The matter is now ripe for adjudication.
22

23          The central issue before the Court is whether Plaintiff John Roehrs' ("Dr.

24   Roehrs") disability insurance policy purchased in, and maintained since, 1992 to October,

25   1999 was part of an "employee welfare benefit plan" within the meaning of the Employee

     Retirement Income Security Act of 1974 ("ERISA").  Title 29 U.S.C. §§1001 et seq.
26

27          The Court having heard the testimony, examined the other evidence filed herein,

28   and considered the arguments and stipulations of counsel, and being fully advised in the case,

     finds upon the relevant facts and law that Defendants have not sustained their burden of

1   proof by a preponderance of the evidence "in the light of all the surrounding circumstances
2   from the point of view of a reasonable person" that an ERISA plan was established or
3   maintained by Dr. Roehrs' former employer for the purpose of providing Dr. Roehrs with
4   disability insurance benefits. Stuart v. UNUM Life Ins. Co. of America, 217 F.3d 1145, 1149
5   (9th Cir.2000)(quoting Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1120 (9th
6   Cir.1998)).

7   Pursuant to Fed. R. Civ. P. 52(a), the Court makes the following Findings of Fact
8   and Conclusions of Law:

9   **Findings of Fact**

10   1(a).  Minnesota Mutual Life Insurance Company ("Minnesota Life") issued a
11   disability income protection insurance policy to Dr. Roehrs in 1992.  The policy was No.
12   1-950-339H.

13   (b).  When the policy was issued in April 1992, Dr. Roehrs was working as a
14   pulmonary specialist for Pulmonary Medicine Specialists, P.C. ("PMS") in Omaha,
15   Nebraska.

16   (c).  PMS was a professional corporation in 1992.  It remained a professional
17   corporation throughout Dr. Roehrs' employment, and it remains in business today.

18   (d).  Prior to obtaining the policy, Dr. Roehrs had another disability policy with
19   a different company.  He paid the premiums personally.  He discontinued that policy when
20   he purchased the policy from Minnesota Life.

21   (e).  All communications with Minnesota Life and the general agent in Omaha,
22   the George Fowler Insurance Agency, on behalf of Dr. Roehrs, were conducted by Carol
23   Anderson or a member of her staff.  Dr. Roehrs never had any direct communication with
24   anyone from Minnesota Life in connection with the purchase of the policy.

25   (f). PMS received the notices that premium payments were due on the Minnesota
26   Life policy.

27   (g).  Until Dr. Roehrs left PMS voluntarily in July 1999, PMS paid the premiums
28   on the Minnesota Life policy. (Exh. 50)

1        (h).  The October 4, 1999 premium for the Minnesota Life policy was not paid

2 on time.

3        (i).  The Minnesota Life policy lapsed for failure to pay the October 4, 1999

4 premium.

5        (j).  On December 2, 1999, Minnesota Life reinstated the policy after Dr. Roehrs

6 paid the premium and executed a Health and Insurability Statement which was part of the

7 Notice of Policy Lapse and Reinstatement Offer ("QRO") sent by Minnesota Life.

8        (k).  In July 1999, Dr. Roehrs voluntarily left PMS, and moved to the Phoenix

9 area, where he went to work for Desert Center for Allergy and Chest Diseases.

10        (l).  Dr. Roehrs did not timely send a change-of-address notice to Minnesota Life

11 advising them that he had moved to Arizona and that premium notices should be sent to him

12 in Arizona. (Joint Final Pretrial Order, ¶ E)(docket # 136)

13        2. After graduating from medical school in Nebraska and finishing his pulmonary

14 medical training at the University of Texas in San Antonio, Dr. Roehrs joined John Connolly,

15 M.D. in his medical practice in Omaha, Nebraska in mid-1979 as a contract employee.

16 (Transcript "Tr." at 81).  PMS was eventually formed in 1980 or '81.  Dr. Connolly initially

17 owned 100 percent of PMS until Dr. Roehrs bought 50 percent of the professional

18 corporation and became an equal owner in approximately 1984 or 1985. (Id. at 81-82)

19        3.  In approximately 1990, Dr. Huerta joined PMS, initially as an employee, and

20 in approximately 1993 or 1994, Dr. Huerta became an equal owner of PMS and a full

21 participating partner in the medical practice. (Id.)

22        4. Dr. Connolly was President of PMS in 1992 and retired in late 1997 or early

23 1998. (Id. at 74, 84)

24        5. Carol Anderson ("Anderson"),who testified at trial via her deposition, is an

25 Omaha, Nebraska certified financial planner. She has a master's degree and a LUTCF (life

26 underwriting training fellow) designation and had been in the insurance and investment

27 business for 24 years as of the date of her deposition on August 20, 2004. (Tr. at 14)

28 Anderson is licensed to sell insurance and securities in Nebraska and several other states.

1   (Id.)  She essentially manages people's money. She has never been a captive agent for any

2   insurance company and has never received any specific training from Minnesota Life. (Id.)

3          6.  In early 1992, Anderson advised Dr. Roehrs that his then disability insurance

4   carrier, Mutual Life, which Dr. Roehrs had been paying for personally by check since 1979,

5   (Tr. at 78), was in financial trouble. (Id. at 79)  The eventual change to the subject Minnesota

6   Life disability policy in April, 1992 occurred at a time when Dr. Roehrs was considering

7   increasing his disability benefits coverage due to his increasing income as a physician. (Id.

8   at 94)   Dr. Roehrs told Anderson that Dr. Connolly had a Minnesota Life disability policy

9   and suggested she compare Minnesota Life's policy and benefits with the other companies'

10  policies she was considering.  Eventually at the direction of Dr. Roehrs, Anderson purchased

11  the subject policy from Minnesota Life through George Fowler ("Fowler"), a general agent

12  for Minnesota Life, effective April 4, 1992.

13         7.  One of the reasons Dr. Roehrs selected Minnesota Life was its "list bill"

14  invoicing. If there were three people insured with Minnesota Life on a list bill form of

15  invoicing, there would be a reduction in the premiums. (Id. at 18)  Minnesota Life would

16  mail the premium notices to PMS' singular address, rather than the multiple addresses of its

17  insureds, and in return, the premiums for each insured's disability insurance coverage would

18  be reduced, obviously benefitting the payor(s).

19         8.  List bill invoicing was mutually beneficial to both the insurer, Minnesota Life,

20  and its insureds, Drs. Connelly and Roehrs.

21         9.  Dr. Connolly told Dr. Roehrs that his disability insurance agent told him that

22  if they had multiple physician disability coverage with Minnesota Life, Drs. Connelly and

23  Roehrs would get a significant discount on their premiums. (Tr. at p. 93)  Increased disability

24  coverage at a discounted premium was an important factor to Dr. Roehrs in deciding whether

25  to purchase disability insurance from Minnesota Life. (Id. at 94)

26         10. In April, 1992, Dr. Roehrs desired to purchase a disability insurance policy

27  from Minnesota Life with an $8500 a month disability benefit. This amount was specifically

28  indicated on the original application form. (Tr. at 53; Exhibit ("Exh") 2 at 2)   It was

important to Dr. Roehrs that the subject policy be accurately written to reflect a higher disability coverage of $8500 per month due to his increasing income in the event of his disability and that the policy also contain an "own occupation" definition of disability. (Tr. at 94)

11(a).  Dr. Roehrs only dealt with Carol Anderson in purchasing the subject Minnesota Life disability policy, (Tr. at 94), and the only handwriting of Dr. Roehrs on the policy's 10-page application is his signature, the date "4/15/92", and the words in the Remarks Section: "(D.) 100 % included." (Exh. 2 at 3 and 8)

(b). Anderson recognizes the rest of the handwriting on the original application as her secretary's which Anderson subsequently reviewed and approved. (Tr. at 35 referring to Anderson's depo at 125,128)

12(a).  On page 3, section D of the original application for the subject disability insurance, the "Yes" box was marked with an "X", indicating that the premiums for the policy were to be paid by the employer and thereafter those premiums would be included in Dr. Roehrs' annual income at year end. (Exh. 2 at 3; Bates #AND048)  Dr. Roehrs testified at trial that this particular box was checked because it was consistent with Dr. Roehrs' intent and understanding, then and now, that at each year's end, PMS' payments for disability insurance premiums, just like his automobile and educational expenses paid by PMS during the year, were included in his annual income through deductions from Dr. Roehrs' year-end bonuses. (Tr. at 90-91, 103, 107)

(b).   Anderson testified that the aforesaid "Yes" box was marked as it was intended by Dr. Roehrs to be marked. (Tr. at 34 referring to Anderson's depo page 124)

(c). Dr. Roehrs' purchase of disability insurance was a voluntary act on his part, not an automatic benefit as a result of his employment with PMS.

(d). The disability policy that Dr. Roehrs purchased in 1992 from Minnesota Life was an individual policy, not a group policy.

13. At all relevant times, PMS' W-2 forms and tax returns were prepared by PMS' accountants, Boil and Hess. (Id. at 91)

1    14.  At all relevant times, and as is stated in both the original application for

2  insurance (Exh. 2 at 3; AND048) and the amended application (Exh.5 at 2; Bates AND039[1]),

3  PMS was a professional corporation, and was considered a "C" corporation for tax purposes.

4  (Stipulation Concerning Tax Issues; docket # 142 at ¶ 1)

5    15.  It is not known whether PMS took tax deductions for the amounts it paid for

6  disability premiums. In other words, the parties cannot determine whether PMS took

7  deductions in the amounts of the disability premiums paid for Dr. Roehrs.  If PMS did, there

8  is no way to determine whether PMS deducted those amounts as ordinary business expenses

9  or as salary paid to Dr. Roehrs.  If Dr. Roehrs reimbursed PMS for the premium payments,

10 either by direct payment by Dr. Roehrs or by PMS reducing the cash amount of Dr. Roehrs'

11 bonuses for each calendar year by the amounts of the premiums, it would not have been

12 proper for PMS to deduct the premiums as ordinary business expenses as opposed to salary.

13 If PMS did deduct them, and if they were deducted as salary expenses, they should have been

14 included in the "Wages, tips and other compensation" in the various Box 1s of Dr. Roehrs'

15 W-2s (Exh. 57) according to applicable tax rules and regulations of the IRS. (Id. at ¶ 2)

16   16.  Due to a lack of documentation (which neither Plaintiffs nor Defendants were

17 able to locate), there is no way to determine precisely what made up the "Wages, tips and

18 other compensation" in the various Box 1s of Dr. Roehrs' W-2s (Exh. 57).  In other words,

19 based on the record, there is no way to determine whether the premium payments were added

20 to Dr. Roehrs' W-2s as income and, therefore, could have properly been deducted by PMS

21 as salary expenses, or whether the premium payments were not added as salary, and,

22 therefore, were perhaps improperly deducted by PMS as ordinary business expenses, or not

23 deducted at all by PMS.  (Id. at ¶ 3)

24

25

26   [1] The trial exhibit the parties refer to as the amended application contains only three
pages. (Exh. 5) The third page is a form on a Minnesota Mutual Life document entitled
27 Amendment Of Application And Certificate Of Insurability and purportedly contains the
signature of Dr. Roehrs and the signature is dated 8/18/92. (Id. at 3; AND038) It indicates that
28 the Application Date is April 15, 1992. (Id.)

17.  Dr. Roehrs' W-2s (Exh. 57) do not provide conclusive evidence concerning whether or not the premium payments were added to his Box 1 "Wages, tips and other compensation."  Defendants withdrew any contention to the contrary.  (Id. at ¶ 4)

.      18.  If disability premiums were specifically added to Dr. Roehrs' W-2s as income, with the effect that they were identifiable as part of the calculation of his taxable income, subsequent disability benefit payments would not be taxable.  This is considered paying for disability insurance on an "after-tax" basis.  (Id. at ¶ 5)

19.  If disability premiums were not specifically added to Dr. Roehrs' W-2s as income, with the effect that they were not identifiable as part of the calculation of his taxable income, subsequent disability benefit payments would be taxable.  This is considered paying for disability insurance on a "pre-tax" basis.  (Id. at ¶ 6)

20. Exhibit 57 contains copies of Dr. Roehrs' W-2 statements for 1993 through 2000 except 1998 which is missing. For years 1993, 1994 and 1995, box 12 ("Benefits included in box 1") is left blank. Box 1 is for "Wages, tips, other compensation." For years 1996, 1997, 1999 and 2000, box 12 contains "0.00"  These exhibits provide neither support nor impeach Dr. Roehrs' testimony that the amount of disability premium payments paid each year by PMS for Dr. Roehrs' disability policy were deducted each year from his year-end bonus or added to his yearly salary. Apparently, Dr. Roehrs' W-2 for 1992 can not be located.

21.  Dr. Roehrs believed the yearly amount of all of his disability premium payments were appropriately allocated by the professional accountants in his annual W-2 income by either reducing his bonus or increasing his income as "after-tax income." (Tr. at 103-107) It was always his understanding while employed by PMS that the premiums for his disability insurance were deducted from his yearly bonus. (Id. at 91)

22(a).  Anderson testified that if the premium for a disability policy were deducted by a corporation like PMS, any benefits paid to an insured like Dr. Roehrs would be taxable income to the insured. If, however, the premiums were paid by the insured as part of his taxable income, any disability benefits paid to an insured would not be taxable income to the insured. (Id.)

1        (b).  Anderson discussed the aforesaid tax benefits with Dr. Roehrs when he was

2  applying for the subject disability insurance and testified that it was Dr. Roehrs' intent at that

3  time that if he ever received these disability insurance benefits, they would be tax free,

4  consistent with the question and answer given in Paragraph D of the original application for

5  disability insurance with Minnesota Life. (Exh. 2 at 3; Bates # AND048) (Tr. at 34 referring

6  to Anderson's depo at 122)

7        (c).  It was Anderson's understanding based upon her discussions with Dr. Roehrs

8  at the time he was applying for the subject disability insurance that Dr. Roehrs intended to

9  personally pay for his disability insurance premiums from his own income so that any

10  disability benefits Dr. Roehrs collected would be tax free to him. (Id. at 34 referring to

11  Anderson's depo at 122-123)

12       23.  Dr. Roehrs' and Anderson's testimony in this regard are credible. Indeed,

13  common fiscal sense supports the practice that the yearly amount an employer pays for an

14  employee's disability premium payments be added to that employee's annual W-2 income by

15  either reducing the employee's bonus or increasing the employee's salary so that if the

16  employee became disabled and was unable to work, subsequent disability benefit payments

17  would not be taxable.

18       24.  Exhibit 56 contains portions of PMS' corporate tax return for 1997.

19  Noteworthy is that box 6a of Exhibit 56 is not marked evidencing an absence of a "welfare

20  benefit plan" at PMS.  Box 6b identifying PMS' pension benefit plan , however, is marked,

21  and is consistent with the trial testimony, that PMS had established an ERISA pension and

22  profiting sharing plan for all of its employees. (Tr. at 75-76)   Each year PMS would

23  contribute a certain amount of money into the plan for each employee. For example, PMS'

24  contribution to Dr. Roehrs' pension and profit-sharing plan was $30,000 per year. (Tr. at 75-

25  76) Apparently, PMS' corporate tax return for 1992 and subsequent years can not be located.

26       25a).  Janice Sandel, a nurse employed at PMS since 1985, testified at trial via

27  her deposition and was not able to provide information regarding what employee benefits Dr.

28

1   Roehrs received while he was employed at PMS or who may have paid for those benefits.

2   She did not write the checks for the payment of employee benefits. (Tr. at 6, 7, and 20-21)

3          (b).  Acknowledging that she has health insurance and a pension profit sharing

4   plan through PMS, Janice Sandel did not have disability insurance paid by PMS at the time

5   her deposition was taken on August 20, 2004 but she believes that PMS did provide her with

6   disability insurance at some time during her nearly 20 years with PMS but she does not recall

7   when. (Id. at 25-27)

8          (c).  Janice Sandel does not know what an ERISA plan is and has never seen

9   anything posted anywhere at PMS indicating that PMS has an ERISA plan for employee

10  benefits. (Id. at 36)

11         26.  Although Dr. Roehrs acknowledges that PMS provided all of its employees

12  with health insurance, (Tr. at 77), he disputes that PMS provided Janice Sandel, a non-

13  physician employee, with disability insurance. (Tr. at 76-78; 86)  As one of the principals and

14  owners of PMS at that time, he claims he would have known if such a benefit were provided

15  to non-physician employees. (Id. at 77-78, 102)

16         27.  Dr. Roehrs' testimony regarding whether only employee-physicians had

17  disability insurance coverage through PMS is more credible than that of Janice Sandel's

18  because as one of the few owners of this small professional corporation the economic

19  survival of which the owners are ultimately responsible, Dr. Roehrs would have more inside

20  knowledge on, and would be more concerned with, the fiscal health of his business and

21  practice than a salaried non-owner employee who was not directly responsible for the

22  economic survival of this medical practice.

23         28(a).  PMS played no role in the process of selecting, administrating or

24  maintaining the subject Minnesota Life policy except to receive and pay the semi-annual

25  premiums. (Tr. at 99, 101-102)

26         (b).  There was no evidence introduced at trial that PMS had a written ERISA

27  plan dealing with employee disability benefits, much less engaging in the active ongoing

28  administration of the such a plan by assisting Dr. Roehrs or any other PMS employee in the

    application or claim process, that it maintained any disability insurance policy forms, that it

1    possessed or processed any paperwork in conjunction with any employee disability claims,

2    or that it engaged in any administrative practices regarding disability insurance.

3        29.  It is undisputed that Dr. Roehrs, not any other PMS employee, applied for

4    the subject policy.

5        30.  The subject policy lists "John D. Roehrs" as both the policy's insured and

6    owner. (Exh. 1 at 1A)  There is no reference in the subject policy to PMS. Any renewal of

7    the policy on a yearly basis or beyond age 65 is not tied to Dr. Roehrs' continued

8    employment with PMS. (Exh. 1)

9        31.  The insurance agent's checklist, a part of the original application, included,

10   among others, Paragraph H:

11       H. Is the purpose of this insurance to provide an Employee Benefit Plan as
         defined under ERISA? If yes, complete Employee Benefit Plan Statement and

12       Qualified Plan Data
         ☐Yes      ☐No

13       1. Are administrative services for this pension plan provided by Minnesota Life?

14       2. Indicate type of benefit plan: ☐Pension Trust ☐Profit Sharing ☐ Split Dollar

15   The "No" box was marked with an "X" at or very near the time the original application was

16   submitted to Minnesota Life or the Fowler Insurance Agency by Anderson's secretary, and

17   reviewed and approved by Anderson, which, according to Anderson, is what Dr. Roehrs had

18   intended. In other words, the purpose of Dr. Roehr's disability insurance policy with

19   Minnesota Life was not to provide an employee benefit plan as defined under ERISA. (Exh.

20   2 at 9; Bates # AND054) (Tr. at 34 referring to Anderson depo at 124-125)

21       32.  By her profession and education, Anderson is familiar with an ERISA plan

22   and an ERISA disability policy. The disability policy that she worked on and ordered for Dr.

23   Roehrs was never intended to be an ERISA policy. (Tr. at 34 referring to Anderson depo at

24   122-123)

25       33.  On page 2 of Exhibit 5, section D of a faxed copy of an amended application

26   for the subject disability insurance, the "No" box is checked, indicating that no portion of the

27   premium for the subject policy would be included in Dr. Roehrs' annual income. (Exh. 5 at

28   2; Bates #AND039) This amended application is dated "8/18/92." The faxed copy indicates

     it was faxed from "George Fowler Ins. Inc." on August 14, 1992 at 12:10, approximately  4

1   months after the original application was submitted to Minnesota Life or its general agent,

2   Fowler. (Id.) The subject policy's issue date was April 4, 1992.[2] (Exh 1at 1; Tr. at 66)

3          34. Dr. Roehrs acknowledged at trial that Exhibit 5 bears his signature (Tr. at 45-

4   46) but that the original of this page (Exh. 2 at 3; Bates #AND048) is the accurate one. The

5   amended application page (Exh. 5 at 2; Bates #AND039) does not accurately reflect what he

6   intended when he initially purchased the policy or thereafter. (Tr. at 53)

7          35. Anderson testified that Exhibit 5 was a necessary document to correct the

8   previous error to increase Dr. Roehrs' monthly disability benefits to $8500 per month. (Tr.

9   at 27 referring to Anderson depo at 54)  She testified that she does not recognize the

10  handwriting at the top of the form, (Tr. at 35 referring to Anderson depo at 125), nor does

11  she know who checked the boxes. (Tr. at 36 referring to Anderson depo at 128)

12         36. It is likely that Exhibit 5 was completed and the boxes checked by someone

13  at Fowler before it was faxed to Anderson for her to give to her client, Dr. Roehrs, to sign

14  and return.

15         37. Dr. Roehrs testified that he signed the original of Exhibit 5, page 2, after it

16  was brought to his office while he was working and staff member presented it to him to sign.

17  He was not sure why he needed to sign it except he guessed it was to correct the prior limits

18  error and increase his monthly benefit disability coverage by $1000. When he signed it, he

19  did not notice the change to the single marked box on the far right in Section D compared to

20  the original he signed months earlier that contained his handwritten statement "(D)100%

21  included" referring to his original intent that he would include in his income at each year end

22  the disability insurance premiums PMS paid during the year. (Tr. at 111-113)

23         38. Dr. Roehrs acknowledged that he handwrote "$8,500" on Exhibit 5 at page

24  3, that his initials are next to the change from $7500, and that it bore his signature and

25  handwritten date at the bottom of the page. (Tr. at 113)

26

27

28

        [2] The Court notes the apparent inconsistency between the policy's April 4, 1992 issue
    date and the April 15, 1992 application date identified on Exhibit 5 at 3;BatesAND038)

1    39.  Dr. Roehrs  likely signed Exhibit 5, page 2, without noticing that someone

2    else had marked the wrong box in Section D which created an inconsistency with his intent

3    to personally pay for all of his disability insurance premiums at each year end.

4    40.  It was not Dr. Roehrs' intent when he signed Exhibit 5, page 2 on August 18,

5    1992 to create an ERISA plan for his disability insurance or that PMS be the ultimate source

6    of funding for Dr. Roehrs' disability policy.

7    41. It was not Dr. Roehrs' intent when he signed Exhibit 5, page 2 on August 18,

8    1992 to exclude the monthly premiums paid by PMS for his disability insurance from his

9    income each year.

10    42. Exhibit 29 appears to be an internal document within Minnesota Life's

11    underwriting department and is titled Notice Of Underwriting. It is purportedly signed by

12    Beth (last name not legible), an apparent underwriter, on June 30, 1992. In the lower third

13    of the document under the section titled "**DISABILITY**," there are seven boxes. One of the

14    preprinted "DI" (presumably meaning disability insurance) boxes is marked with a

15    handwritten "X", and is followed by another box that is not marked which is followed by

16    "OE amt. reduced to $_____." Someone has crossed out a previous entry in an unknown

17    amount and has handwritten the number "7500." Under the **REASON** section further down

18    on Exhibit 29, someone has "X"ed the "Other" box and has written "DI Premiums will be

19    included as part of clients (sic) taxable income. Therefore, need to follow up the Individual

20    'I & P' limits for income of [unknown symbol] $200,000 rather than employer paid benefits."

21    (Tr. at 53-56)

22    43. Defendants failed to produce at trial Beth (last name unknown) or other

23    knowledgeable witness from Minnesota Life or Fowler to explain what was written on

24    Exhibit 29, its source and the significance of the handwritten entries, if any, vis a vis the

25    central issue before the Court.

26    44. Dr. Roehrs had never seen Exhibit 29, or a copy thereof, before the trial of

27    this matter. He knows nothing about the handwritten statements made in Exhibit 29. (T. at

28    110-111)

45. The Court gives no weight to Exhibit 29 because it is unreliable without further foundation and credible explanation by a knowledgeable person in the disability insurance field regarding the handwritten statements thereon or their relation to the central issue in this case.

46. No reliable, credible evidence was presented at trial why it was necessary from a disability insurance or ERISA perspective that the subject disability insurance policy be part of or relate to an ERISA plan in order to increase Dr. Roehrs' benefits $1000 per month to his originally desired disability limits of $8500 per month.

47. Exhibit 16 contains a cover letter, dated November 30, 1992, from Joyce A. Gonzales, an employee of Minnesota Life's general agent Fowler; a Policy Change/Reissue Acknowledgment, dated December 18, 1992; and a copy of a Minnesota Life check, likely a premium refund of some kind, in the sum of $131.70, made payable to John D. Roehrs. (Exh. 16)

48. Dr. Roehrs testified if he received the aforesaid $131.70 check, he "would have deposited it into [his] personal account" because "it was made out to me, it was [his] policy, [he] paid for it, and apparently [he] had an overpayment, [he] guess[ed]." (Tr. at 99) There is no evidence to contradict his testimony.

49. Dr. Roehrs receipt and deposit of the $131.70 refund check, made payable to him and not PMS, into his personal account, rather than endorsing it over to PMS, is circumstantial evidence that Dr. Roehrs, not PMS, was ultimately the payor of the subject disability insurance premiums at each year end.

50. PMS' written employment agreements with Dr. Roehrs for 1996 and 1998, and ones likely similar for prior years, provide no helpful information to the trier of fact on the issue sub judice. (Exh. 33)(Tr. at 85)

51. Dr. Roehrs, through Anderson, initially applied for, and believed he had purchased,  disability insurance coverage in the sum of $8500 per month in April, 1999. See, ¶ 10 supra.  It is undisputed that the original application sought $8500 in benefits per month. (Exh. 2 at 2) Thereafter, it was discovered that a mistake had been made, likely by either Minnesota Life or its general agent, Fowler, that the policy was written for only $7500 per

1   month in disability benefits. It is unclear who made this mistake except it was not made by

2   Anderson or her office, when this mistake was first discovered and who discovered it.

3          52. Exhibit 11 is a written confirmation, dated September 29, 1992, from

4   Minnesota Life sent directly to Dr. Roehrs that indicates that Minnesota Life has "completed

5   [Dr. Roerhs'] request to adjust [his] disability income policy" referring to the policy's

6   disability benefits being $1000 less than the amount Dr. Roehrs requested in the original

7   application. This Exhibit indicates that, effective September 4, 1992, Minnesota Life

8   "[a]dded a $1,000 Additional Disability Monthly Income Agreement with a 90-day waiting

9   period and a benefit period of 'to age 65.'" (Exh. 11)

10          53. Dr. Roehrs was the ultimate source of funding for the subject disability

11   insurance through additions to his income or reduction in his bonuses at each year's end from

12   1992 to 1998.

13          54. The  evidence convincingly demonstrates that PMS neither intentionally nor

14   unintentionally established or created an employee welfare benefit plan within the meaning

15   of  ERISA from 1992 through October, 1999  regarding Dr. Roehrs' disability insurance

16   policy.

17                                    **Conclusions of Law**

18          1.  ERISA defines an "employee welfare benefit plan" to include, among others,

19   "any plan, fund, or program . . . established or maintained by an employer . . . for the purpose

20   of providing for its participants or their beneficiaries, through the purchase of insurance . .

21   . medical, surgical, or hospital care or benefits . . . ." 29 U.S.C. §§ 1002(1), (3); Qualls ex rel.

22   Qualls v. Blue Cross of California, Inc., 22 F.3d 839, 843 (9th Cir.1994) (quoting 29 U.S.C.

23   §§ 1002(1), (3)).

24          2. "The existence of an ERISA plan is a question of fact, to be answered in the

25   light of *all the surrounding circumstances* from the point of view of a reasonable person."

26   Zavora v. Paul Revere Life Ins. Co., 145 F.3d 1118, 1120 (9th Cir.1998) (quoting Credit

27   Managers Ass'n v. Kennesaw Life & Accident Ins. Co., 809 F.2d 617, 625 (9th Cir.1987))

28   (Emphasis in original).

1    3. The Defendants bear the burden of proof on the issue of whether or not there

2    was an ERISA plan and if it was established or maintained by the employer. <u>Kanne v.</u>

3    <u>Connecticut General Life Ins. Co.</u>, 867 F.2d 489, 492 n. 4 (9th Cir.1988), <u>cert. denied</u>, 492

4    U.S. 906, 109 S.Ct. 3216, 106 L.Ed.2d 566 (1989); <u>Zavora</u> at 1120, n. 2.; <u>Schwartz v.</u>

5    <u>Provident Life and Accident Ins. Co.</u>, 280 F.Supp.2d 937, 939 (D.Ariz. 2003).

6    4. "[F]irst, an employer . . . must establish or maintain a plan, fund, or program,

7    and, second, the plan, fund, or program must be established or maintained for specified

8    purposes. In many instances a plan is established or maintained, or both, in writing. It is

9    obvious that a system of providing benefits pursuant to a written instrument that satisfies

10   ERISA . . . would constitute a 'plan, fund or program.'" <u>Donovan v. Dillingham</u>, 688 F.2d

11   1367, 1372 (11th Cir. 1982) (citing 29 U.S.C. § 1002(1)).

12   5. "ERISA does not, however, require a formal, written plan. ERISA's coverage

13   provision reaches 'any employee benefit plan if it is established or maintained' by an

14   employer or an employee organization, or both, who are engaged in any activities or industry

15   affecting commerce. . . . There is no requirement of a formal, written plan in either ERISA's

16   coverage section, . . . , or its definitions section, . . . ." <u>Id.</u>, citing 29 U.S.C. § 1003(a) and

17   1002(1).

18   6. "Some essentials of a plan, fund, or program can be adopted, explicitly or

19   implicitly, from sources outside the plan, fund, or program . . . but no single act in itself

20   necessarily constitutes the establishment of the plan, fund or program." <u>Id.</u>, at 1373.

21   7. "[T]he purchase of insurance does not conclusively establish a plan, fund, or

22   program, but the purchase is evidence of the establishment of a plan, fund, or program; the

23   purchase of a group policy or multiple policies covering a class of employees offers

24   substantial evidence that a plan, fund, or program has been established." <u>Id</u>. at 1373.

25   8. "A decision to extend benefits is not the establishment of a plan or program.

26   Acts or events that record, exemplify or implement the decision will be direct or

27   circumstantial evidence that the decision has become reality – e.g., financing or arranging

28   to finance or fund the intended benefits, establishing a procedure for disbursing benefits,

assuring employees that the plan or program exists – but it is the reality of a plan, fund or program and not the decision to extend certain benefits that is determinative." Id.

9a). "[A]n employer's payment of insurance premiums, standing alone, is substantial evidence of the existence of an ERISA plan." Robinson v. Linomaz, 58 F.3d 365, 368 (8th Cir. 1995) (citing cases from multiple circuits).

b). Neither the parties' nor the Court's independent legal research have discovered any cases that address facts similar to the case sub judice that hold an ERISA plan was created when the employer initially pays the disability insurance premium and the employees thereafter include the cost of said insurance in their income at the end of each year and documentary evidence exits that an ERISA plan was not intended to be established.[3]

10. An individual disability policy can be part of an employee welfare benefit plan under ERISA even when the employer initially pays the premiums and then adds the amount of the employee's premium to the employee's W-2 form at the end of the tax year. Johnston v. Paul Revere Life Ins. Co., 241 F.3d 623 (8th Cir. 2001).

11. "[T]he determinative time period relevant to [the question of whether the Policy is part of an ERISA plan] is when [the Policy] was purchased, not when the claim was submitted . . . ." Schwartz, 280 F.Supp.2d at 940.

12. In the light of all the surrounding circumstances from the point of view of a reasonable person, PMS did not create, establish or maintain an ERISA plan for the purpose of providing Dr. Roehrs with disability insurance benefits. Stuart v. UNUM Life Ins. Co. of

/ / /

/ / /

/ / /

---

[3] The case sub judice is distinguishable from Johnston v. Paul Revere Life Ins. Co., 241 F.3d 623 (8th Cir. 2001). There, the employer had engaged in the ongoing administration of the plan by assisting in the application process, by maintaining the policy forms, by processing paperwork in conjunction with its employee/claimant, and by facilitating the payment of premiums, and the plan embodied a set of administrative practices.

1    *America*, 217 F.3d 1145, 1149 (9th Cir.2000) (quoting *Zavora v. Paul Revere Life Ins. Co.*,

2    145 F.3d 1118, 1120 (9th Cir.1998)).

3          DATED this 16th day of February, 2006.

4

5                                        Lawrence O. Anderson
                                         United States Magistrate Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28